IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CURTIS WILLIAMS | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CIVIL ACTION NO. H-04-3223 |
| | } | |
| VYNCKIER ENCLOSURE | } | |
| SYSTEMS, INC. | } | |
| | } | |
| Defendant. | } | |

**<u>MEMORANDUM & OPINION ON SUMMARY JUDGMENT</u>**

Pending before the court is the Motion for Summary Judgment of Defendant Vynckier Enclosure Systems, Inc. (hereinafter "Vynckier").  (Doc. 16.) The Plaintiff, Curtis Williams ("Williams") brought this action to recover overtime compensation to which he believes he is entitled under the Fair Labor Standards Act, (the FLSA") 29 U.S.C. §§ 201, *et seq.*, as amended, and Williams also sought incentive bonus payments to which he asserted he was due under a contract with Vynckier.  Vynckier defends on the grounds that Williams was a manager not entitled to overtime by virtue of his falling under the FLSA's exemption for management employees, and Vynckier asserts no contract for benefits between itself and Williams existed at all times relevant to this action.


I.          **Applicable Legal Standard : Summary Judgment**

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(c);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the

claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material; i.e., only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986). The movant need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's claims. *Celotex*, 477 U.S. at 323-25. However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). If it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted to rely upon the complete absence of proof of an essential element. *Fontenot v. Upjohn,* 780 F.2d at 1195. If the moving party fails to meet its initial burden, the motion must be denied, regardless of the non-movant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ. P. 56(c). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial. Fed. R.Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157. The non-movant may point to evidentiary documents already in the record that set out specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Furthermore, the non-movant does not likewise have to present its own evidence, but may point out genuine

issues of fact extant in the summary judgment evidence produced by the movant, if any.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

II.            **Factual and Procedural Background**

Vynckier provides boxes or enclosures for electrical wire, and these boxes or enclosures are attached to buildings and residences similar to breaker boxes in houses.  (Doc. 17, Ex. D, pp. 11:24-12:13.)  Vynckier custom manufactures the boxes and also maintains certain sizes in stock.  (*Id*. at 12:9-13.)  Because of the nature of Vynckier's business, Vynckier asserts that its shop and warehouse are recognized departments with a permanent status and continuing function.  (*Id*.at Ex. E, ¶ 4.)

Vynckier hired Williams to work in the company shop in 1993, and in 1998 Vynckier promoted Williams to shop foreman and subsequently to shop and warehouse supervisor, which latter position Williams held at all relevant times to this action.  (*Id*. at Ex. A, pp. 29:5-6, 29:23-25, 34:1-3, 34:14-15; 34:20-24; Ex. B, ¶ 3; Ex. E, ¶ 4.)  Williams did not have a written contract governing his employment, he was an at-will employee and had only a "signed application."  (*Id*. at Ex. A, 111:11-14; Ex. E, ¶ 5.)  Williams stated he was one of only three salaried employees at Vynckier.  (*Id*. at Ex. A. pp. 109:24-110:5.)  Williams walked off the job or quit without giving prior notice on March 9, 2004.  (*Id*. at Ex. B, ¶ 4.)  Prior to his leaving, as of July 16, 2003, Williams was a salaried employee making $28,500 a year, $2,294 per month, $1,147 per bi-weekly pay period, or $548.08 per week, and he admitted his bi-weekly salary in his deposition.  (*Id*. at Ex. A, p. 56:22; Ex. E, ¶ 4.)

As shop foreman, Williams' immediate manager was Juan Garza ("Garza"), the shop supervisor to whom Williams reported; Williams continued to report to Garza and additionally to Larry Downing, Williams' production manager, after becoming shop supervisor himself; after becoming "shop and warehouse supervisor," however, Williams reported only to Garza, as Larry Downing had left the company.  (*Id*. at Ex. A, pp. 37:21-25; 38:11-39:20; 52:20-

53:6; 71:1-2, 110:14-15.)  With the exception of Garza, every other shop/warehouse employee including the foreman was beneath Williams in the company hierarchy.  (*Id*. at  Ex. C, p. 37:15-25.)

Vynckier asserts that as shop and warehouse supervisor, Williams had the authority and discretion to handle day to day operations in the shop and warehouse.  (*Id*. at Ex. B, ¶ 3; Ex. E, ¶ 4.)  When asked about Williams' job duties, Garza testified

> [Williams] supervised all the employees on a day-to-day basis, you know, like shipping and scheduling, manufacturing.  Any issues, he took care of.  He pretty much did everything out there.  He was the guy to go to.  (*Id*. at Ex. C, p. 37:3-5, 37:10-14.)

Vynckier asserts Williams coordinated and managed the entire shop and warehouse, and he exercised discretion throughout the day as it related to those matters.  (*Id*. at Ex. A, p. 86:1-7.) Williams routinely supervised, on a daily basis, at least 25 workers in the shop and warehouse[1], and Vynckier entrusted Williams with the authority and discretion of assigning employee's daily activities, a fact supported by both Jim Carr, the company's President, and Leigh-Ann Moore, Controller and Chief Financial Officer of Vynckier.  (*Id*. at Ex. A, pp. 37:5-10, 42:3-4, 45:5-7, 82:21-83:13; Ex. B, ¶ 3; Ex. E, ¶ 4.)

Williams asserts he spent "maybe a total of thirty (30) minutes" in his office each day, with the rest of his day spent on his feet; he states he spent the remaining part of the whole day outside his office in the shop or warehouse, the latter time accounting for ninety (90) percent of his day.  (*Id*. at  Ex. A, pp. 47:3-9; 82:13-18 )  Williams also asserted that he spent ninety-five (95) percent of his time walking around the warehouse, going to customer service, and observing employees.  (*Id*. at 84:18-25.)  Williams attested to his day-to-day activities

> I usually came in, ran the reports on products that need to be shipped out...
>
> [C]ome back, if that wasn't out, then make a work order for the production line to produce it, get my shipping papers for the warehouse, split them up from one assignment to the next assignment, open up the dock doors, check the trailers and make sure the trailers were shipped right [the night before]....

---

[1]Williams initially stated that he supervised 20 employees who worked in the shop, but this changed to 26 or 27 employees when Williams became shop and warehouse supervisor.

> Secure the building, open up all dock doors, make sure, you know, everything is open for customers, come back in, get with Juan on the daily duties, or the daily objectives, that I had that I saw fit that need to be done, check and make sure that all employees were at work... and basically prepare for the day.  (*Id*. at 45:11-46:11.)

Williams would also walk the warehouse and check for safety violations, and check maintenance on the forklift.  (*Id*. at 46:15-22.)

In his deposition, Williams also testified he was responsible for interviewing job applicants, making hiring or firing recommendations or decisions, disciplining employees, training employees, and evaluating employees.  (*Id*. at 64:15-66:11, 66:17-67:2, 68:11-13.)  For example, Williams acknowledged that on occasion he interviewed applicants and would hire them, but that a majority of the time he and Garza interviewed the applicants together, and while they would sometimes jointly hire an applicant, Garza would sometimes unilaterally make the hiring decision.  (*Id*. at 64:6-65:5.)  He stated that he *did* have the authority to fire individuals and he exercised that authority on occasion.  (*Id*. at 65:23-66:3.)

Williams also handled employee grievances, established work schedules, and approved sick time and vacation times.  (*Id*. at 70:13-23; 71:20-23; 72:5-73:18.)  With respect to establishing employee schedules, Williams would first look at a report detailing how much work was available for the week; he also would direct the employees' daily tasks, and tasks of the night-shift employees, although weekend work was apportioned by Garza.  (*Id*. at 72:2-12; 73:5-13.)  In supervising the night-shift employees Williams provided them with work orders for the production needed to be completed at night.  (*Id*. at 49:24-50:7.)  If there was a machine breakdown, Williams testified he would often leave his home, come to the company and fix the problem; and, he stated he generally worked weekends two times a month for the last four years.  (*Id*. at 51:11-15; 52:3-6.)

With respect to training, unless "leadman" Julio Solis peformed training tasks, on occasion as part of his rounds, Williams would teach employees how to drive a standup lift, how to read the paperwork, [how to know] the sizes of the product sold, how to run and maintain the machinery in the shop, and how to be safety conscious and productive.  (*Id*. at 66:22-67:21.)

After a work order was entered by customer service, Williams would determine what needed to be shipped, he would put such orders into the computer, give the printouts of the orders to employees to complete the shipments, and he maintained paperwork on such work orders in a binder which he used weekly to complete or monitor shipments.  (*Id*. at 83:20-84:12.)   He also asserted in his deposition that he was the only person who continuously went back to customer service to correct paperwork that was misprinted or merchandise that was shipped to the wrong customer addresses.  (*Id*. at 82:23-83:13.)  If a customer called to ensure availability of a product, Williams would check inventory, report back availability of product, and observe to make sure the work was completed; i.e., Williams would check that the shop was supplied with material and that shipments were going out.  (*Id*.)   When employees signed off on paperwork for the tasks assigned by Williams, they would hand the paperwork to Garza.  (*Id*. at 84:13-20.)

Williams described the manner in which he was responsible for "tracking" inventory, and he asserts he did this task by going down or "cycling" down each aisle of the warehouse every Monday or Tuesday  to check that the number, color or location of fiberglass enclosures matched what was in the computer system, after which point he would note any discrepancy in the inventory on paper and Garza would input the information in the computer; he also asserts, however, that he tracked inventory in this manner only in his last three or four months at the direction of Garza, and he did not have input into the flow of materials in inventory, as Garza was responsible for that.  (*Id*. at 75:2-76:20; 79:3-82:12.)  Williams asserts he checked "physical inventory" once a year in a manner like any other employee.  (*Id*. at 76:21-78:24.)

If an employee came to Williams with a grievance, he would write it down and take it to his immediate manager and the two would consult about the situation.  (*Id.* at 70:17-71:11.) Williams also recommended and carried out disciplinary action against those employees who were in breach of company policies.  (*Id*. at 66:4-11.)  As part of his daily job duties, Williams would walk around the building to see if policies were being broken and "enforce" such policies.  (*Id*. at 62:12-25.)  Williams had the authority to first give a verbal warning, then he would write an

employee up; if a violation continuously happened he would suspend an employee; after suspension, Williams would terminate an employee, but Williams would consult with Garza through this process.  (*Id*. at 63:3-64:2.)  Williams and Garza also conducted periodic evaluations of employees Williams supervised, and would discuss an employee's productivity, attendance, attitude, and other matters, in deciding whether to keep a person as an employee at the end of the probationary period.  (*Id*. at 68:11-69.)  Williams also testified that he would approve other employees' vacation and sick time.  (*Id*. at 72:13-73:4.)

Williams did not, however, have authority to sign checks for Vynckier, nor did he have access to a bank account or petty cash fund for the company nor access to any cash.  (*Id*. at 71:12-19.)

Williams states that although his "set time" was actually supposed to be 8:00 a.m. to 5:00 p.m., three years prior to his departure he started coming in at 6:30 or 6:45 to open the building, and Williams would stay until 7:00 in the evening, although three or four times a week he stayed until 10:30 or 11:00 at night, though he would  switch or alternate  his morning arrival time with Garza.  (*Id*. at 47:12-49:17.)  For the last four years, Williams also states he worked eight hours both Saturday and Sunday at least twice and sometimes three times a month.  (*Id*. at 50:17-51:4.)  Williams also kept a record of his hours worked on a calendar checked by Garza daily, and he received approval for vacation or sick days from Garza.  (*Id*. at 55:10-17; 61:16-25.)

Vynckier asserts Williams understood exempt employees would not receive overtime pay, as clearly stated in the employee manual, and as shown by the fact that he signed an ackowledgment form for the manual.  (*Id*. at Ex. E, Bates 000112, ¶ 1, & Bates 000089.)

Relying upon his own affidavit, Williams responds briefly that although he was "labeled" a shop/warehouse supervisor, his responsibilities included non-management tasks such as taking inventory, he could neither hire nor terminate employees as Juan Garza in fact retained this responsibility, nor could he make substantial expenditures on behalf of Vynckier because he was not authorized to sign on Vynckier's operating account.  (Doc. 18, p. 4; Ex. A.)

- 7 -

Although Williams does not have a copy of a written contract proving his assertion, he contends that in 2003 he and Vynckier entered into an agreement whereby the company agreed to pay him an incentive bonus plan ("IBP") equivalent to five percent of his salary on a quarterly basis. (Doc. 17, Ex. A, pp. 106:24-109:314.)  Williams further testified that "[i]t was a written agreement, and [he] signed off on it," and that he received it in lieu of a raise in 2003.  (*Id*. at 107:10-11, 110:6-14.)  Although Williams initially testified the bonus was five percent of his salary, he later testified the bonus was calculated from a production budget, and then he ultimately testified the bonus was five percent of his salary, "plus I did get the incentive bonus part, too."  (*Id*. at 113:13-18, 114:5-21.)  Williams stated, however, that he did not receive bonuses under the plan for "about the last two years" he worked at the Company and that he is due those bonuses.  (*Id*. at 116:17-23.)  Williams does not know how much of a bonus he is due, and he does not know how it is calculated, but it is "some number other than zero."  (*Id*. at 121:18-122:6.)

Though Vynckier admits it did in fact have an incentive bonus plan, which it created in 1995, Vynckier states it terminated the plan as of the third quarter, September 2001, two years prior to the time Williams suggest he signed a contract for such bonuses.  (*Id*. at Ex. D, p.19:17-22; Ex. E, ¶ 5.)  The plan paid bonuses quarterly based upon the "budgeted projected [sales and] profits of the company" for meeting or exceeding the projected budget, as determined by management, and bonuses were based upon the results of the preceding quarter such that they were paid out 45 days after the end of the previous quarter - i.e., September or third quarter bonuses being paid in the middle of November.  (*Id*. at Ex. D, pp. 20:10-21:23.)  Furthermore, Vynckier asserts this plan was not a contract nor was the company obligated to pay bonuses; rather, the company paid bonuses based upon financial goals set by management which, at its discretion, determined the bonus percentages for each employee and the company could suspend, terminate or amend the plan at any time.  (*Id*. at Ex. E, ¶ 5.)  Williams' personnel file confirms he received bonuses consistent with the plan such that he received $1,295 in bonuses in 2001.  (*Id*.)  However, Vynckier asserts that the plan terminated in September 2001, and Vynckier paid the final bonuses to its employees in November 2001.  (*Id*. at Ex. D, pp. 20:18-21:4.)  Vynckier further asserts through the affidavit

of Leigh-Anne Moore that Vynckier had no contract with Williams to pay him any bonuses.  (*Id.*, Ex. E, ¶ 5.)

**III.        Analysis**

    **A.        Limitations**

    Vynckier argues first that Williams' claim for unpaid overtime compensation prior to August 12, 2002, is barred under the FLSA's two-year statute of limitations, as Williams filed his complaint on August 12, 2004, and that such claim should be dismissed.

    Vynckier asserts that because Williams filed his claim for unpaid overtime compensation on August 12, 2004 (Doc. 1), he is not entitled to any putative overtime compensation  prior to August 12, 2002, as the Fair Labor Standards Act, 29 U.S.C. § 255, requires actions to be commenced within two years of their accrual.  (Doc. 17, p. 7.)  The court agrees that any claim for compensation prior to August 12, 2002, would be barred.

    **B.        Executive Exemption**

    Vynckier further argues that Williams' "principal value" to the company was as a manager and that his "primary duties" consisted of "management" rendering him exempt from the overtime requirements of the FLSA.   (Doc. 17, pp. 10-11.)  Vynckier asserts that based upon the record, Williams tasks show that he was a manager or executive as he was responsible for interviewing, selecting, and training employees; setting and adjusting their hours of work; directing the work of employees; maintaining production or sales records for use in supervision and control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; and, disciplining employees.  (*Id.* at pp. 11-12.)

    The FLSA requires employers to pay overtime compensation to employees who work over forty (40) hours per regular workweek.  *G. W. Cobb v. Finest Foods, Inc.*, 755 F.2d 1148, 1150 (5th Cir. 1985) (*citing* 29 U.S.C. § 207)).  Section 13(a)(1) of the FLSA, however,

- 9 -

exempts from the Act's provisions certain employees, including those acting in a bona fide executive, administrative, or professional capacity. *Id.* (*citing* 29 U.S.C. § 213(a)(1)). These exemptions are construed narrowly against the employer, who also has the burden of proof in proving the employee is exempt. *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 402 (5th Cir. 2002) (*citing Dalheim v. KDFW-TV*, 98 F.2d 1220, 1224 (5th Cir. 1990)). Vynckier argues that Williams was, at all times relevant to this action, employed in a bona fide *executive* capacity pursuant to 29 U.S.C. 213(a)(1), and as such, is not entitled to recover overtime compensation. (Doc. 17, p. 8.)

There are two tests for determining whether a person qualifies as an exempt executive, the "long test" for employees earning more than $155 per week but less than $250 per week, and the "short test" for those earning more than $250 per week. *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1137 (5th Cir. 1988); *See also Dalheim*, 918 F.2d at 1224. The "short test" for the executive exemption defines the exempt employee as

> (1) Compensated on a salary basis at a rate of not less than $ 455 per week (or $ 380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.
>
> (b) The phrase "salary basis" is defined at § 541.602; "board, lodging or other facilities" is defined at § 541.606; "primary duty" is defined at § 541.700; and "customarily and regularly" is defined at § 541.701. (29 C.F.R. § 541.100(a)(1)-(4).

In making a determination in this regard, the court must first make findings of historical fact, after which the court makes inferences from the facts in light of the applicable regulations and interpretations promulgated under 29 U.S.C. § 213(a)(1), and then makes the ultimate determination concerning an employee's exempt status as a matter of law. *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000)(*citing Dalheim*, 918 F.2d at 1226.)

The parties do not dispute the term "salary basis" as it applies, and it appears uncontested that the first prong of the regulation is met because Williams was paid $1,147 per bi-weekly pay period, or $573.50 per week.[2]  Therefore, 29 C.F.R. § 541.100(a)(1) is met.  Nor do the parties dispute whether Williams "customarily and regularly"[3] supervised more than two employees.[4]  Evidence has been adduced that Williams supervised twenty-five (25) to twenty-seven (27) employees, and he admitted at his deposition that he supervised employees by giving them work schedules; by walking around the building to see if policies were being broken and enforcing such policies; by giving shipping orders to employees to complete shipments, and maintaining paperwork on such shipping/work orders in order to follow up on them; by teaching employees how to drive a standup lift, how to read paperwork, how to know the sizes of the product sold, how to run and maintain the machinery in the shop, and how to be safety conscious and productive; and Williams provided night-shift employees with work orders for the production needed to be completed at night.  The evidence indicates Williams performed such tasks more than occasionally; for example, Williams testified he "continuously" went to customer service and followed up on shipping.  (Doc. 17, Ex. A, p. 82:23.)  Accordingly, 29 U.S.C. § 541.100(a)(3) is met.

With respect to hiring, firing, and changes in status (29 C.F.R. § 541.100(a)(4)), Williams testified he interviewed applicants and would hire them, but that a majority of the time he and Garza interviewed applicants together, and while they would sometimes jointly hire an applicant, Garza would sometimes unilaterally make the hiring decision.  He stated, however, that

---

[2]Vynckier asserts that the amount is $1,147 or $548.08, apparently based upon its calculations from the evidence.  (Doc. 17, p. 4, ¶ 9; Williams Depo., Ex. A, p. 56:22; Ex. E.)  Whether the weekly base salary  was $573.50 (half of $1,147) or $548.08, the amount is *over* the requisite $455 per week.

[3]The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.  29 C.F.R. 541.701

[4] The regulations state that "[t]wo or more employees" refers both to the necessity for such employees to be full-time employees or their equivalent in half-time employees.  29 C.F.R. § 541.104(b).  However, the same section of regulation states that an "employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement."  29 C.F.R. § 541.104(c).

he *did* have the authority to fire individuals and he exercised that authority on occasion. Furthermore, Williams testified that in supervising employees, he had authority to discipline employees, though he would confer with Garza before taking disciplinary action.  In the affidavit attached to his response to the motion for summary judgment, Williams now asserts flatly that he could neither hire nor terminate employees as Garza, in fact, retained this responsibility.  (Doc. 18, p. 4; Ex. A.)  To the extent this conflicts with his deposition testimony regarding his ability to *fire*, the court agrees with Vynckier that Williams cannot now create a dispute as to material facts with an affidavit which directly contravenes his earlier deposition testimony.  However, even though Garza may in fact have made the final decision on any hire or termination[5] of an employee, and even though Williams would confer with Garza in disciplinary matters before taking disciplinary action, Williams admitted that hiring decisions were sometimes made jointly with Garza, that he participated in such processes, and that when Garza approved his recommendations, Williams would act on them.  An employee's suggestion and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status."  29 C.F.R. § 541.105.  It is furthermore not denied that Williams considered hiring, firing and disciplining to be part of his job duties, though it is unclear with what frequency such suggestions and recommendations were made and at what frequency they were relied upon.  *See Id.*   Therefore, the court finds that 29 U.S.C. § 541.100(a)(4) is met.

Therefore, central to the instant action is 29 C.F.R. 541.100(a)(2), which section requires exemption of those employees "whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." With respect to the final prong in the court's analysis of the executive exemption, under § 541.100(a)(2), the court notes initially that there appears no dispute of Vynckier's assertion that the shop and warehouse of which Williams was the supervisor, were recognized departments with

---

[5]Though Williams stated unambiguously that he could fire individuals without consulting with Garza.

a permanent status and continuing function.[6]  The court must next determine Williams' primary

duty.[7]

> As a general rule, an employee's "primary duty" involves over 50% of the
> employee's work time. And yet, flexibility is appropriate when applying this rule,
> depending on the importance of the managerial duties as compared with other
> duties, frequency of exercise of discretionary power, freedom from supervision,
> and comparative wages. *Lott*, 203 F.3d at 331 (*citing Smith v. City of Jackson*,
> 954 F.2d 296, 299 (5th Cir. 1992)).

"Under the "short test," the employee's primary duty will usually be what he does that is of

principal value to the employer, not the collateral tasks that he may also perform, even if they

consume more than half his time."  *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866

(N.D. Tex. 2001) (*citing Dalheim*, 918 F.2d at 1227)).  In considering whether an employee's

primary duty consists of "management", among the factors to consider are

> (1) the relative importance of the managerial duties as compared with other types
> of duties, (2) the frequency with which the employee exercises discretionary
> powers, (3) the employee's relative freedom from supervision, and (4) the
> relationship between the employee's salary and the wages paid other employees
> for the kind of nonexempt work performed by the supervisor.  *Vela v. City of
> Houston*, 276 F.3d 659, 677 (5th Cir. 2001).

The tasks on which Williams worked fall into the categories of "management" tasks provided by

the regulations.[8]  Williams has admitted he managed and coordinated the entire shop and

warehouse and exercised discretion in doing so, supervising at least 25 employees for whom he

scheduled daily tasks.  He similarly scheduled work for the night-shift.  In fact, Williams' regular

tasks are identical to the acts enumerated by the regulation as managerial tasks.  Williams created

work assignments or orders, tasks, and work schedules for employees; he monitored the shipping

of products; he walked the warehouse checking for safety violations and checked or performed

---

[6]Pursuant to 29 C.F.R. § 541.103, no argument has been provided that the shop and warehouse were
simply a "collection of employees assigned from time to time to a specific job or series of jobs."  29 C.F.R. §
541.103(a).

[7]*See* 29 C.F.R. 541.700

[8]The regulations interpret or define "management" tasks to include interviewing, selecting, and
training employees; setting and adjusting their hours of work; directing the work of employees; maintaining production
records for use in supervision or control; appraising employees' productivity for the purpose of changes in status;
handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques
to be used; apportioning work among the employees; controlling the flow and distribution of materials or merchandise
and supplies; providing for the safety of the employees; and, monitoring or implementing legal compliance measures.
29 C.F.R. § 541.102.

maintenance on equipment; he enforced company policy; he noted grievances, carried out disciplinary actions, and approved sick and vacation time for employees; he interviewed and helped hire and fire employees and conducted evaluations of them; he provided employee training; and, he helped maintain the inventory of the company's products.  In *Kastor v. Sam's Wholesale Club*, William Kastor the plaintiff was a manager of Sam's Wholesale Club's bakery department where, among other tasks, he

> directed the work of bakery employees and was responsible for making out their work schedules, conducted annual employee performance evaluations, interviewed and trained new employees, addressed employee grievances, and disciplined employees in his department, including giving verbal and written reprimands, *although recommendations to terminate an employee were referred to the general manager.* 131 F. Supp. 2d at 863-64 (emphasis added).

Kastor also contended that ninety percent of his time was spent performing the same exact work as hourly employees in actual preparation of baked goods, packaging, stocking items for sale, refilling inventory on the selling-room floor, getting supplies, sweeping and cleaning the production areas, and taking food orders from customers.  *Id*. at 865.  The court nevertheless concluded that Kastor's principal value to the bakery department was as a manager, and the court pointed out that Kastor essentially used his discretion in taking a more proactive role in production on the non-managerial tasks of other employees.  *Id*. at 866-67.  Kastor also contended that he did not have independent discretion or final decision-making authority to schedule employees to work over 37.5 hours per week, fire or hire employees, or to increase an employee's rate of pay  without receiving approval; that he simply ordered items for inventory in predetermined quantities according to store specifications; that he performed employee evaluations based on the company's defined standards and policies.  *Id*. at 867.  The court, relying on the *administrative* exemption, stated that "[i]f final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such and employee under the regulations."  *Id*.

In *Roberts v. National Autotech, Inc.*, as a Store Manager, the plaintiff Roberts was the highest ranking employee at his store, and as part of his duties he promoted training classes to

employees; ensured that jobs were done correctly based on return rates; generated weekly profit reports for overseeing the progress of the store with the Operations Manager; decided which vendors to use from a list; set schedules for some employees; performed formal or informal evaluations of and disciplined technicians and Service Writers; recruited and hired at least one individual; and, had recommendations for firing approved. *Id*. at 678. Although Roberts had also emphasized that he spent the majority of his time performing the duties of a Service Writer, answering the phone, driving customers to and from work, going and getting parts that were not delivered on time, and cleaning the bathroom, the court nevertheless found that his primary importance to the store was as a manager. *Id*. at 678-79. The court found that Roberts was exempt *executive* but not an *administrator* under the FLSA, and emphasized an important distinction in the approach of the two categories

> Here, the Plaintiff's exercise of independent judgment and discretion was very limited as to matters of significance even though his primary importance to his employer was managing the store. The primary managerial duties of the Plaintiff's position, most of which were mechanical rather than discretionary, thus do not cause him to fit within the parameters of the administrative exemption of the FLSA, even though they do endow him with exempt executive status. 192 F. Supp. 2d 672, 680 (N.D. Tex. 2002)

While Williams may not have been involved in designing policies for Vynckier, in preparing reports on profits, or in making purchases or selecting vendors, albeit the latter may have been impacted by the limited nature of Vynckier's business, he nevertheless exercised the *kind* of discretion which has been found by the courts to at least meet the executive exemption for managers. The court therefore finds that as a matter of law, Williams was in fact exempt and not subject to the FLSA's overtime requirements.

### C.     Incentive Bonus Plan

Vynckier asserts that Williams is not entitled to any bonus payments as no contract existed with Williams for these bonuses, such bonuses were discontinued prior to the time he claims he became entitled them, and that such bonuses were wholly discretionary with upper management.

Though Williams remembers reading a contract instituted in 2003, entitling him to bonuses and signed by Vynckier's managers, he cannot produce such a document and he is not certain how bonuses were calculated under such a plan or contract.  Although Vynckier admitted that it did in fact have a bonus plan which paid bonuses quarterly based upon the "budgeted projected [sales and] profits of the company," and although Williams did receive such a bonus for three quarters in 2001, such a plan existed wholly by the discretion of upper management which could terminate the plan at any time, and managmeent did in fact do so after the third quarter of 2001, prior to the time Williams asserts he entered any contract for bonuses.

The court notes that in describing Williams' contentions, the court has relied soley on his deposition statements as Williams has not opposed Vynckier's arguments against a bonus in either his response to Defendant's Motion for Summary Judgment or in his affidavit attached thereto.  Such failure to respond is presumed by the court under the local rules to be a statement of non-opposition, and as Williams has apparently abandoned arguing in support of his claim for a bonus, such a claim is denied on this ground alone.  Nevertheless the court notes that under the current state of factual development, the court cannot find that a contract for bonuses existed between Williams and Vynckier.

The essential elements of a breach of contract are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.  *Valero Marketing & Supply Co. v. Kalama Intern.*, 51 S.W.3d 345, 351 (Tex. App.-Houston (1st Dist. 2001, no writ).  To show breach of the contract entitling Williams to a bonus in 2003, Williams would have to put forth evidence of offer, acceptance, meeting of the minds, consent to the terms by each party, and execution and delivery of the contract with intent that it be mutual and binding. *Prime Products, Inc. v. S.S.I. Plastics*, 97 S.W.3d 631, 636 (Tex.App.-Houston [1st Dist.] 2002, no pet.)  Though Williams must first show that he had a valid contract, he has admitted he has no hard copy of such a contract.  Even if the court were to attempt to find such a contract from the evidence adduced, which consists of nothing but Williams' conclusory statements, in fact, the

evidence provided demonstrates without dispute that Vynckier terminated its bonus plan prior to the time that Williams is asserting that he became entitled to such payments under a contract, which he states occurred in 2003.

Under Texas law, an at-will employment relationship does not prevent the employer and employee from entering into a contract on any matter except if the contract would limit the ability of either to end the employment at will. *Light v. Centel-Cellular Co. v Texas*, 883 S.W.2d 642, 644 (Tex. 1994). An enforceable agreement can only emanate from an at-will employment relationship if the consideration for the promise is not dependent on a period of continued employment. *Id*. at 644-45. Because a promise that does depend on continued employment-at-will does not bind the promisor, who always retains the option of discontinuing the employment instead of performing its obligations, any such promise is illusory. *Id*. at 645 (*citing East Line & Red River R. Co. v. Scott*, 72 Tex. 70, 10 S.W. 99, 102 (1988). If a promise is illusory, it does not constitute a valid consideration; "[w]hen illusory promises are all that support a purported bilateral contract, there is no contract." *Id*. at 645 & n.5. There is no dispute that Williams was an at-will employee and that the purported contract made with him was dependent upon the discretion of management.

A promise to pay a bonus is not enforceable given the facts of this case, when bonus payments wholly in the discretion of management, and Vynckier had discretion with respect to the amount "each employee" would receive. (Doc. 17, Ex. E, ¶ 5.) In addition, a bonus plan can be unenforceable for the reason that the employee offers nothing but his continued employ. "[T]he law is well established that "a promise to pay a bonus is unenforceable for want of sufficient consideration since the employee is only giving the same service he has already contracted with the employer to render." *Castranova v. Teknerkron Infoswitch, Inc.*, No. Civ.A. 3:00-CV-0361, 2003 WL 22143793, *2 (N.D. Tex. Aug. 18, 2003) (*citing* 3 Williston on Contracts § 7:38 (4th ed. 2003)). As in *Castranova*, there is no evidence that Vynckier promised Williams an annual non-discretionary bonus at the commencement of his employment in exchange for Williams' overall

work performance.  *See id.*  Therefore, the court does not find that Vynckier has breached a contract with Williams to pay him bonuses.

**IV**          **Conclusion**

Accordingly, it is hereby

ORDERED that the Motion for Summary Judgment of Defendant Vynckier Enclosure Systems, Inc. (Doc. 16) is GRANTED.

SIGNED at Houston, Texas, this 27th day of October, 2005.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE